*Saturday,*
*April 1st.*

## Lessee of SMITH *against* FOLWELL.

*A.* devises all his real estate to his son *B.*, and his heirs lawfully begotten; and in case of his death without such issue, he orders *C.* his executors and administrators to sell the real estate within two years after the son's death; and he bequeaths the proceeds thereof to his brothers and sisters by name, and *their heirs* forever, *or*

EJECTMENT for a messuage and lot in the city of *Philadelphia*, in which the following case was stated, to be considered as a special verdict.

" *John Bleakley* the elder, being seised in fee of the premises in the declaration mentioned, on the 8th day of *August* 1768, duly made and executed his last will in writing of that date, and thereby devised as follows: " As for and concerning my " worldy estate, I give, devise, and bequeath, the same in " manner following, &c. I give and bequeath to my brother " *David Bleakley*, living in the north of *Ireland*, the sum of 10*l.* " sterling. Also, I give and bequeath to my brother *William* " *Bleakley*, living near *Dungannon*, the sum of 10*l.* sterling. " Also I give and bequeath to my sister *Margaret Harkness*, " of *Dungannon*, the sum of 100*l.* sterling. Also I give and " bequeath to my sister *Sarah Boyle*, wife of the rev. Mr. *Boyle*, " the sum of 10*l.* sterling. Also, I give to my cousin *Archibald* " *Young*, of *Philadelphia*, an annuity of 30*l. Pennsylvania* mo-" ney, to be paid him out of the rents and profits of my real

*such of them as shall be living at* the death of the son, to be divided between them *in equal proportions*, share and share alike. All the brothers and sisters die, leaving issue. Then *C.* dies, and afterwards *B* , the son, without issue. *Heirs* is a word of limitation; and none of the brothers and sisters being alive at the death of *B.*, the object of the power to sell, has failed; their issue are not entitled; and a sale by the executors of *C.* conveys no title.

A power to *C.* and his executors to sell, may be executed by the executors of *C.'s* executor, if the object of sale continues. .

" estate, on the 25th day of *March* in every year, during the
" joint lives of him the said Archibald Young, *and my son*
" John Bleakley *or his heirs lawfully begotten; but in case of*
" *the decease of my said son without issue lawfully begotten as*
" *aforesaid, in the lifetime of the said* Archibald Young, *then the*
" *said annuity is to cease, and in lieu thereof I give and bequeath*
" *unto the said* Archibald Young *and his assigns the sum of*
" 400*l. sterling, payable out of the proceeds of my real estate,*
" *when the same is sold and disposed of* according to the inten-
" tion of this my will hereinafter mentioned, *and before any*
" *dividend is made of the proceeds of my said estate;* and this
" legacy or bequest is made to my said cousin *A. Y.* not only
" for the natural affection I have and bear to him as a relation,
" but *also as a full compensation* for the services he has already
" rendered me, and in lieu of his commission for the trouble
" he may hereafter have in the execution of this my will. All
" the rest and residue of my estate real and personal, &c. I
" give, devise, and bequeath to my son *John Bleakley and his*
" *heirs lawfully begotten; and in case of the decease of my said*
" *son without such issue, then I do direct and order my said*
" *cousin* Archibald Young, *his executors or administrators,* to
" sell and dispose of my real estate *within two years after*
" *the decease of my said son* John Bleakley, to the best advan-
" tage; and *I do hereby give and bequeath the proceeds thereof*
" *to my said brothers* David Bleakley *and* William Bleakley,
" *and my said sisters* Margaret Harkness *and* Sarah Boyle,
" *and their heirs forever, or such of them as shall be living at*
" *the decease of my said son, to be divided between them in equal*
" *proportions, share and share alike,* after deducting out of
" such proceeds the sum of 400*l.* sterling, herein before given
" and bequeathed to the said *A. Y.* immediately on the decease
" of my said son without issue, in lieu of the annuity above
" mentioned; and in case my said son should die before he at-
" tains the age of 21 years without issue lawfully begotten as
" aforesaid, then my will and mind is, that the remainder of
" my personal estate hereby intended for my said son at his
" own disposal, if he should live to attain the age of 21 years,
" shall *go and be divided amongst my said brothers and sisters*
" *with the proceeds of my real estate, as is herein before direct-*
" *ed to be divided."* The testator then appointed *Archibald*
*Young* his executor, and in the same year died seised."

" *John Bleakley* the younger, the devisee named in the said will, afterwards, to wit, in the same year, entered into possession of the premises therein mentioned, of which the premises named in the declaration are part, and held and enjoyed the same until the 3d day of *September*, 1802, when he died of full age and without issue, after having duly made his last will in writing, bearing date the 19th of *April*, 1802, and thereby appointed *Joseph Parker Norris* his executor." (By this will the testator directed his real and personal estate to be sold, and the proceeds, after paying legacies, to be divided among certain of his relations share and share alike.)

" On the 25th day ·of *May*, 1803, the said *Joseph Parker Norris*, executor as aforesaid, in consideration of 7000 dolls. lawful money of the *United States*, to him paid by *William Folwell*, the defendant in this action, bargained and sold the said premises to the said *William Folwell* and his heirs."

" The following legatees, named in the will of the said *John Bleakley* the elder, and who were next of kin to him, as well as to *John Bleakley* the younger, died at the following periods, that is to say, *Sarah Boyle* between the years 1760 and 1770, leaving issue who are still alive; *William Bleakley* in the year 1775, leaving issue who are still alive; *David Bleakley* in the year 1790, leaving issue who are still alive; and *Margaret Harkness* in the year 1794, leaving issue who are still alive."

" The said *Archibald Young*, executor of the will of the said *John Bleakley* the elder, on the 3d of *May* 1782, duly made and executed his last will in writing; and thereof appointed *Robert Correy* his executor, and died on the 27th of *May* in the same year, without having disposed of the premises in the declaration mentioned."

" On the 24th of *April*, 1797, the said *Robert Correy* duly made and executed his last will in writing, and thereof appointed *Eleanor Correy* and *James Boyde* executors, and afterwards died, to wit, on the 1st day of *June* 1802, without having disposed of the premises in the declaration mentioned."

" On the 1st day of *February*, 1805, the said *Eleanor Correy* and *James Boyde*, executors as aforesaid, for a valuable consideration in lawful money to them paid by *James Smith*, the lessor of the plaintiff, bargained and sold to him and his heirs the premises in the declaration mentioned. The said *James Smith*, at the time of the said purchase, had notice of

the deaths of the said *D. Bleakley, W. Bleakley, S. Boyle,* and *M. Harkness;* and that they died before the decease of the said *John Bleakley* the younger. He also had notice, at the time of his said purchase, of the said deed by *Joseph P. Norris* to *W. Folwell.*"

1809.

Lessee
c.<sup>r</sup>
Smith
v.
Folwell.

" If on these facts the law be with the plaintiff, then judgment to be entered for him, with 6 cents damages, and 6 cents costs; but if the law be with the defendant, judgment to be entered for him."

The case was argued at last *December* term before the whole court.

*Dallas* for the plaintiff. The personal representatives of the brothers and sisters of *Bleakley* the father, are entitled to the proceeds of the real estate; and not the devisees of *Bleakley* the son. By the father's will, the son has a clear estate tail in the realty; the reversion in fee descends to him, subject to a power in *Young* and his executors to sell, upon his dying without issue living at the time of his death; and by this sale, the fee is transferred to the vendee. *Lancaster* v. *Thornton* (a) and *Warneford* v. *Thompson* (b). There are but two questions. 1. Whether the facts establish the existence of a power to sell. 2. Whether there is any object for the exercise of the power.

1. The existence of the power depends upon two circumstances: the son's dying without issue living at the time of his death, and the continuance of the authority up to the time of sale. That the life of *Archibald Young* is not essential to the raising of the power, is evident for various reasons: he is a mere instrument; his death is provided for by the substitution of his representatives; the clause which commutes the annuity for 400*l.*, makes it depend upon his being alive at the death of the son without issue, but the clause which directs the sale, makes it depend solely upon the death of the son without issue; the brothers and sisters are the second object of the testator's bounty, and to make a power for their benefit hang upon the life of an indifferent person, is absurd. Then as to the continuance of the authority: The direction is to *Young*, his executors and administrators; and the executors of the executor may perform it. *Shep. Touch.* 464. 8 *Viner,* 465. *pl.* 3. 467. *pl.* 16. 2 *Brownl.* 194. *Keilway* 44. *Co. Litt.* 113. *a. note* 146. *Tenant*

(a) 2 *Burr.* 1027.　　(b) 3 *Ves. jr.* 515.

v. *Brown* (*a*). There can be no objection from the remoteness of the power. The sale must be made within two years after the son's decease; and the division is to be between such as are living *at* the decease; therefore the power is to arise upon the death of the son without issue living at the time of his death.

2. With respect to the objects of the power, the material inquiry is the testator's intention. The land which is ordered to be sold is to be considered as money, 1 *Fonbl.* 414; and it is to be divided between the brothers and sisters, or such of them as were living *at* the son's death, and their *heirs. Heirs* is not of necessity a word of limitation. *Bamfield* v. *Popham* (*b*). It is often used as a designation of the person. *Burchell* v. *Durdant* (*c*). The intent of the testator being the principal rule for the exposition of the will, he is excused from using the strict and proper terms of law; *it is enough, if he has sufficiently declared his intent. Heirs* is not necessarily a word of limitation here, because the property being money, an absolute estate passes without it: a principle of which the testator was aware, when in a certain event he devised his personalty to his *brothers and sisters*, without more. It must be used therefore to bring in the *issue*, who are generally called heirs, and not to qualify the estate. The testator could never have intended to make the sale and distribution of his estate depend upon his old brothers and sisters surviving his young son; the event was too improbable. But it is reasonable to attribute to him an affection for the stock, which, upon the failure of his own, he wished to advance; and an intention, that the heirs of such as should be dead, that is their *issue*, should take *per stirpes*. Construing the term as a limitation, his object as to the heirs is defeated; treating it as a word of purchase, and a designation of the legal representatives, the whole will is supported; and this result is a sufficient justification for laying aside the technical meaning. *Darbison* v. *Beaumont* (*d*). The death of the brothers and sisters before the son, is therefore immaterial, as their issue were living at the son's death, to come in under the description of heirs. But granting that they must take in the quality of heirs, we contend that they *can* take. The brothers and sisters were either to take by way of executory devise, or they had a contingency coupled with an

(*a*) 1 *Chan. Ca.* 180.          (*c*) 2 *Ventr.* 311.
(*b*) 1 *P. Wms.* 59.'          (*d*) 1 *P. Wms.* 230.

interest, which was both devisable and descendible. As an executory devise, *Porter* v. *Bradley* (a) is in point, that although they died before the contingency, their children take; so is *Gurnell* v. *Wood* (b). As a contingency coupled with an interest, the right of their representatives is clearly supported by *King* v. *Withers* (c). There a devise was of 2500*l.* to a daughter, at 21 or marriage; and if a son should die without issue male living at his death, she was to have 3500*l.* more at 21 or marriage; and if the son's death did not happen before 21 or marriage, she was to have the money whenever it did happen. She died before the son, who afterwards died without issue male; and her administrator took. The principle, that these possibilities coupled with an interest, descend, and may be devised, has been settled law since *Selwyn* v. *Selwyn* (d). So are *Goring* v. *Bickerstoffe,* (e) *Knight* v. *Knight,* (f) *Roe* v. *Jones,* (g) and *Perry* v. *Phillips* (h). All that is necessary is that there should be somebody ready to take when the contingency occurs.

*Rawle,* for defendant, made three points. 1. That the will contained a clear devise of all the realty to the son in tail. 2. That a power was limited to arise on a contingency, depending upon the events, *first,* of *John Bleakley* the son's dying without issue living at the time of his death; and *secondly,* of the brothers and sisters, or some of them, surviving the son so dying; which last event not happening, the power never arose. 3. That the fee which descended to the son, was unaffected by the power, and passed by his will to his executor, who sold to the defendant. The first point, he said, was incontrovertible; and the third was settled by the second; of course he confined himself to the second point, upon which he argued as follows. The son must die without issue living at the time of his death, before the estate goes over; and when it does go, it goes to the brothers and sisters and their heirs, or such of them as are living at the son's death. The first question is as to the meaning of the word *heirs.* The general rule, that it is a word of limitation, is not to be questioned. There is even an anxiety in courts that the heirs shall take by descent, and not by purchase, as appears from

1809.

Lessee
of
SMITH
*v.*
FOLWELL.

(a) 3 *D. & E.* 143.  (d) 2 *Burr.* 1131.  (g) 2 *H. Bl.* 30.
(b) *Willes* 211.  (e) *Pollexf.* 32.  (h) 1 *Ves. jr.* 251.
(c) 3 *P. Wms.* 414.  (f) *Pollexf.* 44.

*Shelly's case* (*a*), *Coulson* v. *Coulson* (*b*), and *Hodgson* v. *Ambrose* (*c*). In *Brett* v. *Rigden* (*d*) rather than construe heirs to be words of purchase, the devise was suffered to lapse. If a testator uses technical words only, courts are bound to understand them in a legal sense; if he connects them with words which shew a different meaning, his intention prevails. But there are no such words here. What, however, are the consequences of considering the term as a description of the person, and allowing the heirs to take by purchase? Manifestly, that they cannot take *per stirpes*, which is argued to have been the testator's design. Purchasers must take *per capita;* and then if one brother be dead leaving nine children, they will take three fourths of the whole estate, and the surviving brothers and sisters one twelfth each. Was this the intent of the testator? Clearly not; the division is to be share and share alike. There is no alternative then but to consider heirs, not as a description of the person, but as a word of limitation. And this is confirmed by the contingent devise of the personal property, which is to be divided among the *brothers and sisters, with the proceeds of the real estate, as before directed;* and to which the issue could not make a pretension upon the death of the ancestor before the contingency. It is confirmed also by this, that if it is a word of purchase, it does not qualify the estate of the brothers and sisters; and then the testator must have intended them merely a life estate, which is impossible. Being a word of limitation, if the ancestor took nothing, nothing comes to the heir, *Moorhouse* v. *Wainhouse:* (*e*) and the only remaining question is, whether the ancestor did take any thing. In this case every thing is contingent: the person to take, the time, and the quantity. A division is ordered among *such as shall be living* at the death of the son; that is, such of the brothers and sisters. Every thing depends upon that contingency; it is therefore a *bare* possibility that any one of them shall take. There is no interest coupled with it, to devise or transmit; for every thing depends upon the party's being himself *in esse.* This distinguishes it from all the cases read. In *Porter* v. *Bradley*, there was no contingency that the persons who were to take should be alive at the death of the first devisee without issue. There was a general limitation over to the daughters and their issue, upon the

(*a*) 1 *Rep.* 98. 104.     (*c*) *Doug.* 341.     (*e*) 1 *W. Bl.* 638.
(*b*) *Stra.* 1125.     (*d*) *Plowd.* 343.

death of the son without issue living at his death; and no collateral event was required to exist at the same time. So was *Gurnell* v. *Wood*, *King* v. *Withers*, and the rest.

If the proceeds are personalty, the legacy is lapsed; for in a devise of personal property, heirs, and heirs of the body, are rejected; the legatee takes absolutely, and his executor, not his heir. *Leonard Lovie's case* (*a*), *Robinson* v. *Fitzherbert* (*b*), *Webb* v. *Webb* (*c*). If the devise had been to the brothers and sisters and their executors, or such of them as should be living, &c. where would have been the doubt?

There being no person entitled to receive the proceeds, no sale can be made against the interest of the heir at law, for whom equity will restrain the trustee, *Bradley* v. *Powell* (*d*), *Yates* v. *Phettiplace* (*e*), *Tournay* v. *Tournay* (*f*), *Roper* v. *Radcliffe* (*g*), *Croft* v. *Lee* (*h*). The object ceasing, the power ceases; and the purchaser from the trustee with notice, like the lessor of the plaintiff, becomes himself trustee for the *cestui que trust*, or in this case, for the devisees and vendees under the son's will. *Saunders* v. *Dehew* (*i*), *Mansell* v. *Mansell* (*k*).

*Tilghman* on the same side. The heir is the favourite of the law of *England*, and not to be disinherited but by express words, or necessary implication. He should be still a greater favourite here, where all the children make but one heir, and in this case, where the son was *totus hæres*. It is agreed he took an estate tail by devise, and the fee by descent; he must therefore have a right to dispose of the fee by will, unless prevented by the plain and legal intent of the father. It is said he is prevented by a sale under a power in the father's will; and the only questions are, 1. Whether such a power ever existed. 2. Whether there ever existed any objects for the exercise of it.

1. If the power is to arise after an indefinite failure of the son's issue, it is too remote. If no time is fixed, it is bad, for uncertainty. If any time is fixed, I submit, that it is the death of *Bleakley* the son without issue, *living Archibald Young*. *Young* was to have the annuity of 30*l.* as long as he and the

| | | |
|---|---|---|
| (*a*) 10 *Rep.* 87. | (*e*) 2 *Vern.* 416. | (*i*) 2 *Vern.* 271. |
| (*b*) 2 *Bro. C. C.* 127, | (*f*) *Prec. Chan.* 290. | (*k*) 2 *P. Wms.* 681. |
| (*c*) 1 *P. Wms.* 132. | (*g*) 9 *Mod.* 171. | |
| (*d*) *Cas. Talb.* 193. | (*h*) 4 *Ves. jr.* 60. | |

son, or he and the son's issue lived; but if the son died without issue in the lifetime of *Young*, he was to have 400*l.* out of the proceeds of the real estate, and *before any dividend was made.* This shews that the real estate was to be sold only in a case in which *Young* was to have 400*l.* Further; by the first part of the will, the gross sum is to be paid upon the son's dying without issue in the life of *Young;* and by the latter part, the sale is directed upon the death of the son without *such issue*, that is, in the life of *Young*. I agree that his executors and administrators were to sell, provided the power arose by his surviving the son, and dying before the two years; and hence their introduction. The testator might have supposed that the son would come of age in *Young's* life, and that if he outlived *Young*, he would do what was right himself; therefore the life of *Young*, however immaterial *per se,* was not so in connexion with the son's life, but was likely to be a proper circumstance by which to limit the raising of the power. The disposition of the personalty shews that the testator considered *Young* as surviving. The son was to have it on attaining 21; but it was to be divided with the real estate, if the son died before 21 without issue lawfully begotten *as aforesaid,* that is, living *Young*. No one can have the proceeds until *Young's* 400*l.* are paid; it is a compensation for his trouble in selling and remitting; there can be no sale without it. Was it the testator's intention to prevent the son from alienating during his whole life after *Young's* death? It cannot be. But it might be proper to restrain him during the probable period of *Young's* life; and therefore that life is essential to the power.

2. If the power arose, was there any object in whose favour it could be legally or equitably executed? It is agreed that the whole was contingent. Whoever was to take was to be alive at the son's death. We say brothers and sisters; they say, and the children of such as were dead. As to their being purchasers and taking *per stirpes*, Mr. *Rawle's* argument is conclusive; and yet it is clear they cannot take in any other way; therefore they cannot take at all. *Such of them* cannot mean of the heirs, but of the brothers and sisters; otherwise, there is a double contingency, which is bad. The event is clearly doubtful. If heirs are meant, the persons are doubtful also; and then there is one contingency upon another. 1 *Fearne* 378. Heirs

cannot take by purchase unless there is *descriptio personæ;* this rule is unquestionable. Now suppose the brothers and sisters had died in the life of the testator; it cannot be argued that their children would take; but there is no reason against it, except that they would derive nothing from their ancestors; and this is conclusive to shew there is no *descriptio personæ.*

As to the power of the executor to sell, the general principle is plain. But at law, the executor derives merely from his testator. *Young* never had authority to sell, as he died before the son; and therefore his executor derived at law no power from him. Then, though equity might order an execution of the power by *Young's* executor, or even by the heir, it will never do it, where nobody is entitled to the proceeds, and there is a bona fide purchaser from the heir. The sale under *Young's* will is therefore bad both in law and equity.

*Lewis* in reply. If *Bleakley* the son did not die in the life of *Young*, there was no reason for *Young's* having the 400*l.*; and therefore when his compensation is spoken of, the testator gives it only in case of his son's death without issue " in the " lifetime of the said *Archibald Young;*" but when the devise is made to the brothers and sisters, *Young's* life is not required, but the duty is to be performed by him or his representatives. Neither is any thing said of his survivorship in the devise of the personalty. His life therefore is not essential to the power. If it is, two consequences follow, which are quite improbable: first, that the testator intended to benefit his brothers only in the event of a stranger's death; and secondly, that if *Young* died before the son, and the son died afterwards under age and without issue, nothing was intended to pass under the will, but the heir at law was to take the whole. I contend that the death of the son without issue, is all that is necessary to raise the power; and that the land is to be sold absolutely upon that event, without regard to any other. Whoever may own the proceeds, the lessor of the plaintiff owns the land. The sale is to be made within two years after the son's death without issue. Of course the failure of issue is referible to that time. Under what circumstances is it to be made? As to *Young*, his life was immaterial; he was a mere instrument. It is said his executors are substituted, because he might survive the son, and die before

1809.

Lessee of
Smith
*v.*
Folwell.

1809.

Lessee
of
Smith
v.
Folwell.

the sale. But in such an event the substitution would be use-less; equity would make it for the testator, the power having arisen. The only design of the substitution was to provide for the power in the event that has happened: a dying before the son. As to the brothers and sisters, the direction to sell is distinct from the division between them and their heirs: the one is peremptory, the other is conditional. It does not follow because the property is sold, that the proceeds must go to them. The testator did a discreet thing in merely changing the property, and permitting the law to distribute. Had he stopt at the order to sell, there could have been no doubt; and in effect he has stopt there; for he does not couple the order with the distribution, by saying that for the purpose of dividing he directs the sale, or to the intent, or in order to, divide; but there are two distinct and independent orders, one to sell, and the other to divide. But supposing objects of sale to be necessary, we say they exist. One question on this part of the case is, whether the children take by descent or purchase. I agree the general rule; but heirs certainly may be a word of purchase, if it is so intended. The brothers and sisters were advanced in life when old *Bleakley* made his will; the son was young; and therefore there was a probability of their death before his; in which event it was his desire that their children should take, and hence the word *heirs.* The effect of the term is to be limited according to his intent; he did not know the legal meaning of descent or purchase; his design was that the children should stand in *loco parentis* throughout. I see the difficulty of their taking by purchase, where one brother is dead leaving children; but it is obviated by assigning to him the intention, not that they should take technically either by descent or purchase, but that they should stand exactly as their parent would have stood. But if this will not hold, then the authorities of Mr. *Dallas* do shew that a contingent executory interest commenced in the brothers and sisters, which was transmitted to the children, and became consummate in them upon the son's death without issue. It is exactly the case of *Pinbury* v. *Elkin:* (*a*) where one made his wife executrix, and gave her all his goods and chattels, provided she died without issue

1 *P. Wms.* 563.

by the testator, in which event after her decease, 80*l.* was to
remain to A.; A. died before the testator's wife, and his repre-
sentatives took. So a devise to A. and his heirs, and if he dies
before 21, to B. and his heirs. A. dies before 21, and B. dies
before him; B.'s heirs take. 8 *Viner* 112. *pl.* 38. 377. *pl.* 11.
2 *Ventr.* 347.

*Cur. adv. vult.*

Upon this day the judges delivered their opinions.

TILGHMAN C. J. The question in this case arises on the
will of *John Bleakley* the elder, and is to be resolved by ascer-
taining what the contingency was, on which the testator autho-
rized his executor to sell his real estate, and divide the proceeds
among his brothers and sisters. If that contingency has taken
effect, the plaintiff will be entitled to recover, because there is
no doubt, that the power to sell is extended to the executors of
the original executor; nor is it in its nature more remote than
the law permits, being to take effect on the expiration of a life
then in existence. But if the contingency has not taken effect,
the plaintiff has no title.

The objects of the testator's bounty appear to have been his
son, his brothers and sisters, and his cousin *Archibald Young*,
whom he made his executor. In the first part of his will he
gives a small legacy to each of his brothers and sisters; and to
*Archibald Young* an annuity of thirty pounds, *Pennsylvania*
currency, to be paid out of the profits of his real estate " during
" the *joint* lives of the said *Archibald Young*, and his son *John*
" *Bleakley*, or *his heirs lawfully begotten;* but in case of the de-
" cease of his said son without issue lawfully begotten *as afore-*
" *said*, in the lifetime of the said *Archibald Young*, then the
" annuity was to cease, and in lieu of it, *Archibald Young* was
" to have 400*l.* sterling, payable out of the *proceeds* of the tes-
" tator's real estate, when the same was sold and disposed of as
" was afterwards in the said will directed." If we pause here,
we find the testator's intention very clearly expressed, that his
real estate was to be sold, in case his son died without issue
during the life of *Archibald Young;* or in case he left issue, and
that issue should die without issue during the life of *Archibald
Young*. I am by no means satisfied that this intention was not
preserved throughout the will, although in a subsequent part,

VOL. I. 4 B

which I will next consider, there are expressions not strictly reconcilable with it; and which afford strong ground for arguing that the testator designed that his real estate should be sold, in case his son should die without leaving issue *living at the time of his death*, without regard to the life of *Archibald Young*. His words are as follow. " All the rest and residue of my estate, " real and personal, I give, devise, and bequeath to my son " *John Bleakley*, and his heirs lawfully begotten; and in case of " the decease of my said son without such issue, then I do " direct and order my said cousin, *Archibald Young*, *his execu-* " *tors or administrators*, to sell and dispose of my real estate, " within two years after the decease of my said son, to the best " advantage. And I do hereby give and bequeath the proceeds " thereof to my said brothers, *David* and *William Bleakley*, and " my said sisters, *Margaret Harkness* and *Sarah Boyle*, and " *their heirs for ever, or such of them as shall be living at the* " *decease of my said son, to be divided between them in equal pro-* " *portions, share and share alike*, after deducting the sum of " 400*l.* sterling, herein before given to the said *Archibald* " *Young*, immediately on the decease of my said son without " issue, in lieu of the annuity above mentioned." Here is, to be sure, an express power to sell, given to the *executors* of *Archibald Young;* but that power might be necessary at all events, because *Archibald Young* might survive the testator's son, and die within the two years, during which the sale was to be made, without having completed the sale. But as my opinion on this case will be founded on another point, I decline giving any opinion, whether, on the whole of the will, the power to sell was intended to be restricted to the event of *John Bleakley*, the son, dying without issue *in the life of Archibald Young*. I do not consider this point as by any means clear; and if the case rested solely upon it, I should feel myself inclined to give as much weight to the direction to the executors of *Archibald Young* to sell, as it would reasonably bear; because it would tend to favour the brothers and sisters of the testator, who, next to his son, were the objects of his affection.

Supposing then, that the authority to sell was to arise on the event of the son's dying, without issue living at the time of his death, it remains to be considered for what purpose the sale was to be made. The literal expression is, that the proceeds shall be equally divided between the testator's brothers and sisters and

their heirs, or such of them as should be living at the time of his son's death. But none of them were living at that time. Therefore, to follow the literal expression, there were no persons in existence, in whose favour the power to sell could be exercised. It appears to me, that the literal interpretation accords with the spirit and intent of the testator. For, although it might be reasonable to restrain the son from making any disposition of the real estate, to the prejudice of the testator's brothers and sisters, who were naturally dear to him, yet it would be hard to impose such a restriction merely to secure the estate to nephews and nieces living in a remote country.

It is contended by the counsel for the plaintiff, that the word *heirs* may be taken as a word of purchase; and that, by virtue of it, the *heirs* of the deceased brothers and sisters may take. There is no doubt but the word *heirs* may be so construed, when it appears that the testator used it with a view of *designating* a particular person. But is it so used in this will? I think not. It is intended to have the effect of giving the property *completely* to the brothers and sisters, who were to take. It is not an accurate expression; because it is applied to *personal* property, to *money*, which does not go to *heirs* but to *executors*. However, it is very commonly used in wills, to denote an intent that the legatee shall have the *absolute* property in money. To construe the word *heirs* otherwise than as a word of limitation in this will, would introduce a confusion never intended by the testator. It was his intent that the persons who took, should take in *equal* portions. Now suppose that one of the brothers had *died*, leaving several children; and the others had been all *living* at the death of *John Bleakley*, the son. Would *each child* of the deceased brother have taken an equal share with the surviving brothers and sisters? This is so monstrous, that the plaintiff's counsel do not contend for it. They say, that all the children of the deceased should take among them the share that their parent would have been entitled to, if living. This certainly would be very equitable; but where do we find it in the will? It is *making* the will, not *construing* it. I am satisfied that the testator, when he gave the direction to sell, did not look beyond the lives of his brothers and sisters; and if this construction was not sufficiently clear from the parts of the will which I have mentioned, it is confirmed by a subsequent clause, in which he directs, that, in case his son

dies without issue, before the age of twenty-one years, the remainder of his *personal* estate (intended to be at his son's disposal if he attained the age of twenty-one) shall go to, and be divided between, *his brothers and sisters*, with the proceeds of his real estate, as *before directed.*

The plaintiff's counsel made another point, which it is necessary to mention; that is, that it was the intent of the testator that his real estate should be sold at all events, in case of his son's death without issue. But to this I cannot agree. It is true, that to *sell* is one thing, and to *dispose of* the proceeds of the sale is another; but to what purpose is the sale to be made, if there is no person in existence to receive the *proceeds?* The *cause* of the sale ceasing, the *authority* to sell must cease likewise.

Upon the whole of this case, my opinion is, that the contingency, on which the power to sell was to arise, has never taken effect, and therefore the sale under which the plaintiff claims, was without authority. Of consequence he has no title, and judgment must be entered for the defendant.

YEATES J. delivered his opinion at large in concurrence with the Chief Justice, upon all the points. On the first point however, whether the power to sell did not depend upon the death of the son in the life time of *Archibald Young*, his Honour said, that as the claim to the 400*l.* was made in positive terms to depend upon the son's dying without issue in the lifetime of *Young*, and as the 400*l.* was to be paid before any dividend of the proceeds of sale, in his mind it irresistibly followed, that as the son survived *Young*, the legacy did not arise, and the lands could not be sold.

BRACKENRIDGE J. In this case the annuity payable to *Archibald Young*, " during the joint lives of him the said *Archi-* " *bald Young*, and the son *John Bleakley*, or his heirs lawfully "begotten," ceases on the death of *Archibald Young*, who died before *John Bleakley* the younger. But the 400*l.* is a bequest to depend on the son *John Bleakley's* dying without issue. For it is stated to be to him " the said *Archibald Young*, and his assigns;" and executors and administrators are assigns in law. It is further stated to be " to my said cousin *Archibald Young*, not only for " the natural affection I have and bear to him as a relation,

"but also as a full compensation for the services he has already "rendered me, and in lieu of his commission for the trouble "he may hereafter have in the execution of this my will;" and it was in the contemplation of the testator, that *Archibald Young* might not himself live to execute the will, since he continues the direction and order of executing the will, to the executors and administrators of *Archibald Young.* There was therefore the same reason that this 400*l.* should come to the representatives of *Archibald Young,* his executors or administrators rendering the service, as there was originally that it should come to himself. And though " in lieu of his commission for the trouble "he may hereafter have in the execution of the will" is stated as an inducement of the bequest or legacy, yet " natural affec-"tion and a compensation for services he has already render-" ed," is also an inducement; and there would be an object of sale for the raising this legacy if no other did exist. For though the legacy of 400*l.* is stated to be given in lieu of the annuity, yet it is not a commutation, but a substitution; and the termination of the annuity is marked as the commencement of this other provision: that is, it is as much payable as if no annuity had preceded it; and although it is " in case of the decease of "my said son without issue lawfully begotten in the lifetime " of *Archibald Young,*" that the annuity is to cease, yet the power is continued to the executors and administrators for the purpose of the sale. *Archibald Young* dying before sale, yet sale can be made by his executors or administrators, the 400*l.* will be payable, and the dying before the son can have no effect but as it *limits the annuity.* This object therefore of the sale of the property, and the distribution arising on the sale, did not cease by the death of *Archibald Young* before the death of *John Bleakley* the son.

But taking it, that the contingency of *John Bleakley* the son dying in the lifetime of *Archibald Young* not happening, the bequest of 400*l.* is not claimable by his representatives, yet the main object of the sale in case of *Bleakley* the son dying without issue, was for the use of the devise over of the proceeds of the estate: " I do hereby give and bequeath " the proceeds thereof;" and there was a reason for a devise of the proceeds rather than of an undivided interest in the realty itself, because it superseded the expense and trouble of *partition.* That the estate in *John Bleakley* the son, determined on dying without issue, is clear; and that the remainder over in fee

1809.

Lessee
of
SMITH
v.
FOLWELL.

vested in the trustee *Archibald Young*, or his executor or administrator, for the purpose of sale, is also evident. For had even the authority been naked, and not coupled with an interest, yet by act of assembly, 3 *St. Laws* 200. " when by the last " will and testament of a decedent, a naked authority only to " sell lands shall be given to executors, they shall take and hold " the same interest in such lands, and have the same powers "·and authorities respecting the same, as if the lands were de- " vised to them to be sold." Nor does the main object of the sale cease on the brothers and sisters or either of them dying before *John Bleakley* the son, provided the brothers and sisters or either of them left children. For the devise of the proceeds is to·" brothers and sisters, *and their heirs, or such of them* " as shall be living at the decease of my said son," to be divided between them in equal proportions, share and share alike. To whom? To brothers and sisters, or to heirs of brothers and sisters, who shall be living at the decease. By the word heirs, I understand children. What use of the word heirs, if children were not meant? For the proceeds on a sale going to a brother or sister, being personal estate, would give them the absolute interest, without the word heirs. And by the word heirs, I take to be meant children, because in the language of the people it means children, and it is in this language that the will is written. The popular meaning ought not to be set aside for a technical sense that defeats the general intention, which seems to have been that the estate should go over to brothers and sisters, and their *issue*. It is on the death of *John Bleakley* the son, and of the brothers and sisters, that the proceeds come immediately to the children. But coming to them as the children of brothers and sisters, they take, as one person, that share which would have come to those whom they represent. It would seem absurd to devise to persons and their heirs, or such of them as should be living, and, in construction, to confine the living to the persons themselves, who must cease to live before there can be heirs, that is surviving children. Were it necessary to derive the interest through the stock, we might be embarrassed with the law of descent; but the children of the stock are the immediate takers, the stock ceasing to exist. The devise is to brothers and sisters, and *their heirs*. It cannot mean heirs general, and those who are equally the heirs of one brother and sister as of another, but the heirs of each brother and

sister severally: that is to the children of each the share of the parent. I understand it to be as much as to say that the parent not living, the child or children shall take, or offspring, or issue, or heir, which is the word used. The extreme case strikes me of a brother or sister surviving without children, and the three others deceased leaving children; in which case, on the opposite construction, the brother or sister without a child, would take the whole, and the children of the deceased nothing; which would seem to defeat totally all use of the *word* heirs.

My impression upon the whole of this will is, that the testator meant that in case of his son dying without issue living at the time of his death, the estate should go over; that a legacy should go to *Archibald Young*, or his representatives, of 400*l.*, and the remainder to brothers and sisters of the testator, or brothers' and sisters' children, but a sale to be made and the proceeds to be distributed; and that *Archibald Young*, his executors or administrators should make the sale, which sale should be made within two years after the contingency of the son dying without issue. Where there is an executor, or an executor of an executor, as in this case, there can be no administrator; and therefore the executor of the executor succeeds to the trust. The sale has been made by the executor, and it is good; for it is a principle of law, that no execution of a trust shall fail for want of a trustee; and a court of chancery in *England*, where a trustee fails, will appoint a trustee. With us the law will sanction the act of him who succeeds to the management of the affairs, the pursuit of the rights, and the discharge of the duties of the deceased.

The testator would not seem directly to have contemplated the event of *Archibald Young* dying before the son; but he has contemplated the dying after and *before sale made;* and the provision he has made with an eye to that event, in giving power to executors to sell, has embraced a case which he may not have had immediately in view, the dying before the son. For the sale by executors cannot be affected by the dying before; nor do I think the right to the legacy ought to be affected. There is nothing in it but that the annuity ceased sooner, and the estate, in the hand of the son, has been *pro tanto* relieved. Being however, clear as to the intention of the testator in regard of brothers and sisters and their children, and that intention having nothing in it unnatural or harsh, but on the contrary equal, and

to be approved, I am not disposed to yield easily to objections drawn from the application of principles of an artificial system.

What rule of law is there to oppose this construction? The son took an estate tail by implication. The dying without issue means the dying without issue living at the time of his death. This is the meaning in common parlance, and it is sanctioned by decisions. There is therefore no indefinite failure of issue, and the contingency is not too remote. The remainder goes over. The children, if not in *esse* at the time of the devise, take what the law calls an *executory remainder*. They take on two contingencies. But it is not what is called a double contingency; for the last is *collateral* to the first, connected with it, and springing out of it, and therefore in fact but a single contingency, the children of a certain description of persons taking on the son dying without issue. If they must be considered as taking the real estate, they take it immediately under the devise, and without coming through the stock, but take the interest the stock would have taken. They take by purchase; and under the designation of heirs, or children, the heirs of each brother and sister take a fourth. That heirs may be construed children cannot be disputed. There are innumerable authorities to this. On the contingency happening, the fee is in the persons designated according to their proportions, or in the trustee for their use. There will be no abeyance. So that I can see nothing in the way of taking it as a devise of real estate, or real estate reduced to personalty, the proceeds to be divided. I am therefore of opinion that the plaintiff recover.

Judgment for the defendant.